### ATLANTIC & M. G. S. S. CO. v GUGGENHEIM et al.

(District Court, S. D. New York.    June 9, 1903.).

**1. SHIPPING—ACTION FOR DEMURRAGE—DEFENSES.**

Under a contract for the carriage of a number of cargoes of coke between certain ports by two vessels, which provided that the vessels should be kept a regular period apart as much as possible, where the vessels were accepted and loaded when tendered, and the freight was paid, without any protest or objection, although they were not kept a regular period apart, and no damage is shown to have resulted, the shipper cannot set up such breach of the contract in defense to an action for demurrage.

**2. SAME.**

Under a provision of a contract of affreightment requiring the shipper to load the cargo as fast as the vessels can receive the same, adverse weather conditions are not a defense to an action to recover demurrage for a failure to comply with such stipulation.

In Admiralty.    Action for demurrage.

Convers & Kirlin, for libellant.
Wheeler, Cortis & Haight, for respondents.

ADAMS, District Judge.    This is an action brought by the libellant to recover from the respondents $2,267.50 demurrage, alleged to be due under a contract between the parties, engaged in business in New York City, which is found in the following letters:

"New York, July 28, 1898.

"Messrs. M. Guggenheim's Sons, New York City—Dear Sirs:  We beg to confirm the arrangement with you to the effect that you will furnish us with a full cargo of Coke for three trips each of two schooners (to be named hereafter) of the capacity of about 1250 gross tons coke each, on the following terms, viz.:

"The Coke to be loaded at Pensacola, Fla., free on board vessels as fast as they can receive same, trimming to be paid by us,—and to be delivered free into railway cars at Tampico, Mex., you paying freight to us in New York at the rate of $2.25 (two dollars and twenty-five cents) U. S. C'y per gross ton delivered, on receipt of evidence of delivery.

"It is understood that we shall not be required to absorb any new dues or other new charges which may be imposed at Tampico by the Mexican Government other than those now existing.

"The first vessel is now about to leave Boston for Baltimore to load for Tampico, and proceeds thence, to Pensacola, light, to enter on this contract. The second vessel to follow about two or three weeks later.  We are to keep

---

¶ 1. Demurrage, see notes to Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.

the vessels a regular period apart as much as possible, giving you full information as to their movements.

"Your confirmation of the above understanding will constitute a contract between us.

"Yours very truly,    Atlantic & Mexican Gulf S. S. Co.,
"By [Signed] E. W. Gould, President."

"New York, July 30th, '98.
"Atlantic & Mexican Gulf Steamship Co., 27 Williams Street, City—Dear Sirs: We are in receipt of your favor 28th inst., and beg to confirm the arrangement specified therein, for the furnishing of two schooners, three trips each, for full cargoes of coke from Pensacola, Fla., to Tampico, Mexico, at freight rate of $2.25 per gross ton, delivered free into railway cars at Tampico, Mexico.

"Yours very truly,    M. Guggenheim's Sons."

At the time of the making of the contract, the libellant had options on two schooners, the Eva B. Douglas, of 1040 registered tonnage, and the Cassie F. Bronson, of 952 registered tonnage, which it exercised upon the completion of the contracts with the respondents. The vessels were delivered to the libellant at Pensacola on January 17th and 20th, 1899, and the libellant and the respondents then entered upon the performance of their contract. The schooners were duly loaded by the respondents and proceeded to Tampico, where they discharged their respective cargoes and returned for the second loads.

The libellant claims that the Douglas was in readiness to load the second time on the 18th of February but the loading was not completed so that she could sail before March 1st and 8 days' demurrage became due at the rate of ten cents per registered ton, amounting to $832, and that the Bronson was in readiness to load at noon on the 21st of February but the loading was not completed until March 10th about 2 P. M., and 15 days' demurrage became due at the same rate, amounting to about $1450.

There is no dispute about the loading on the first or third trip. The defences as to the second trip are, in substance: (1) That the detention in loading was primarily caused by the libellant's delay in getting the vessels to Pensacola, bringing the time of loading into winter weather, which at the time of the second trip, had become very severe, thus making it impossible for the respondents to provide the cargo promptly; (2) that the vessels were not kept by the libellant at a proper interval apart as agreed in the provision of the contract, "We are to keep the vessels a regular period apart as much as possible, giving you full information as to their movements," and delay was caused thereby; and (3) that the amount of demurrage claimed is excessive.

1. It is conceded by the respondents that they did not avail themselves of any right of cancellation they might have had but they contend that they did not by their conduct deprive themselves of a right to claim damages for a breach of the contract and to set them up by way of defence in this action, citing Scrutton on Charter Parties (4th Ed.) p. 60. The principle involved is there stated:

"The breach of a condition precedent being waived by one party in so far that he does not repudiate the contract converts the condition precedent into a simple term of the contract, its breach giving an action for damages."

The respondents, however, have not proved that they had suffered any damages, nor do they seek to offset any claim of that character, but to defeat the libellant's right of action or to substantially reduce its recovery. It is not clear that they would be entitled to do so, if there were any merit in the claim, which is doubtful. The respondents accepted the vessels and loaded them, without demur or protest, and paid the freight earned on all three trips without a suggestion that there had been any breach of contract or that they had suffered any damages by reason of the late arrival of the vessels at Pensacola.

2. It appears that the libellant did what it could to keep the vessels apart. On the first trip, the Douglas arrived at Tampico, en route to Pensacola, October 30th, and the Bronson, November 24th. After that the vessels were delayed by congestion of traffic there, so that they were not kept apart to the full extent of the specified time but there was no absolute covenant that they should be. The agreement, as qualified by the phrase "as much as possible," in connection with the provision concerning information to be given to the respondents, was performed. Full information, to the extent of the libellant's power, was given to the respondents of the vessels' movements and specific three weeks' notice of the second trip of each vessel. The delay in loading was not caused by any delay in arriving but by the failure of the respondents to provide the agreed cargo.

Weather conditions, even if adverse, would not affect the obligation of the respondents to perform their stipulation to load the vessels as fast as they could receive the cargoes. Kearon v. Pearson, 7 H. & N. 386.

3. With the defences eliminated, it is not clear for what amount the libellant is entitled to a decree. This question will be referred to a commissioner for examination and report, unless the parties can agree upon the proper sum.

Decree for the libellant, with an order of reference.